UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 23-20592-CIV-CMA

BURGER KING COMPANY LLC,

    Plaintiff,

vs.

EDUARDO E. DIAZ, EYM KING OF
MICHIGAN, LLC and EYM KING, L.P.,

    Defendants.
_____/

## PLAINTIFF BURGER KING COMPANY LLC'S AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Burger King Company LLC ("BKC"), by and through the undersigned counsel, sues Defendants Eduardo E. Diaz ("Diaz"), EYM King of Michigan, LLC ("Company"), and EYM King, L.P. ("EYM") (Diaz and EYM are hereinafter collectively referred to as "Guarantors"), (Guarantors and Company are hereinafter collectively referred to as "Defendants") and states:

1. This is an action to enjoin Defendants' unauthorized use and display of BKC's valuable trademarks and service marks in connection with the unlawful operation of 14 restaurants as authorized BURGER KING® restaurants. Additionally, this is an action for money damages against Defendants for breaches of their written agreements with BKC.

## THE PARTIES

2. Plaintiff BKC is a Florida limited liability company with its principal place of business located in Miami, Florida.

3. Defendant Company is a Texas limited liability company with its principal place of business located in Texas.

4. Defendant EYM is a Texas limited partnership with its principal place of business located in Texas.

5. Defendant Diaz is a citizen and resident of Texas.

## JURISDICTION AND VENUE

6. BKC operates and franchises restaurants throughout the World. BKC's franchise operations are conducted and supervised from its World Headquarters located in Miami, Florida. BKC and Defendants have carried on a continuous course of direct communications by mail, e-mail and telephone through BKC's World Headquarters in Miami, Florida.

7. The course of dealing between BKC and its franchisees, including Defendants, shows that decision-making authority is vested in BKC's World Headquarters in Miami, Florida.

8. Defendants negotiated with BKC in Miami, Florida for the acquisition of long-term franchise agreements and other agreements with the knowledge that they would benefit from their affiliation with BKC.

9. Defendants voluntarily entered into franchise and guarantee relationships with BKC, which envisioned continuing and wide-reaching contacts with BKC in Florida, including regulation of their franchised businesses from BKC's World Headquarters in Miami, Florida.

10. Defendants have purposefully availed themselves of the benefits and protection of Florida law by entering into franchise and guarantee agreements with BKC which expressly provide that Florida law will govern any disputes among the parties.

11. Defendants have breached written agreements which were to be performed in Florida due to their failure to timely make payments to BKC in Miami, Florida. These breaches have caused damage to BKC at its headquarters in Miami, Florida.

12. This Court has jurisdiction over this action based upon:

  (a)  Section 39 of the Lanham Act, 15 U.S.C. 1121, and 28 U.S.C. 1331, 1337, and 1338 (a), for the claims arising out of Defendants' violations of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. 1114 and 1125(a); and,

  (b)  28 U.S.C. 1338(b), and the doctrine of supplemental jurisdiction as codified in 28 U.S.C. 1367, for the claims arising out of Defendants' common law unfair competition and Defendants' breach of contract.

  13. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 and the forum selection clauses agreed to by the parties in the written agreements.

  14. Defendants have further agreed in writing that in any litigation to enforce the terms of the various franchise and guarantee agreements between BKC and Defendants, BKC, as the prevailing party, shall be paid by Defendants all costs, including attorneys' fees, incurred as a result.

  15. BKC has engaged undersigned counsel and has agreed to pay counsel reasonable attorneys' fees for all services rendered in this action and otherwise in connection with enforcing the franchise and guarantee agreements between the parties.

  16. All conditions precedent to the institution of this action have been satisfied, discharged, excused, and/or waived.

## THE BKC MARKS

  17. To identify the source, origin, and sponsorship of BKC's facilities, products, and services, BKC has extensively employed, caused to be advertised, and publicized throughout the United States certain distinctive symbols as trademarks and service marks (the "BKC Marks"). BKC was the first to adopt and use the BKC Marks as trademarks and service marks, and all right, title, and interest to the BKC Marks and the design, decor, and image of BURGER KING®

restaurants remain vested solely in BKC.

18.     BKC operates and franchises BURGER KING® restaurants using the BKC Marks on signs, menu boards, posters, translights, uniforms, plates, cups, tray liners, and other items, and in advertising to the public through television, radio, and print media.

19.     Set forth below is an abbreviated listing of the BKC Marks registered in the United States Patent and Trademark Office:

| Reg. No. | Mark | Issue Date |
|---|---|---|
| 0782990 | HOME OF THE WHOPPER | 1965 (renewed through 2025) |
| 0869775 | BURGER KING | 1969 (renewed through 2029) |
| 0899775 | WHOPPER | 1970 (renewed through 2030) |
| 0901311 | BURGER KING logo | 1970 (renewed through 2030) |
| 1057250 | BURGER KING logo | 1977 (renewed through 2027) |
| 1081348 | HAVE IT YOUR WAY | 1978 (renewed through 2028) |
| 1550398 | CROISSAN'WICH | 1989 (renewed through 2029) |
| 2428846 | BURGER KING Crescent Logo | 2001 (renewed through 2021) |

20.     The registrations of the BKC Marks are currently in full force and effect, and BKC has given notice to the public of the registration of the BKC Marks as provided in 15 U.S.C. §1111. BKC owns each of the registrations for the BKC Marks listed above.  BKC has the exclusive right to use the BKC Marks in the United States.

21.     Pursuant to franchise agreements between BKC and its franchisees, BKC grants its franchisees a limited license and authority to use and display the BKC Marks, but only in such manner, and at such locations and times, as are expressly authorized by BKC.  In no event is a franchisee authorized to use the BKC Marks after the expiration or termination of its franchise. Such unauthorized use is expressly prohibited under the terms of all BKC franchise agreements, including Defendants' BURGER KING® Restaurant Franchise Agreements with BKC.

22.     BKC's products bearing the BKC Marks are offered and sold in interstate

commerce.

23. BKC and its franchisees have spent many millions of dollars in the United States and abroad advertising and promoting BKC's restaurants, services, and products.

24. The substantial investment made in the BKC Marks has resulted in valuable good will for the BKC Marks and for the restaurants, products, and services bearing those marks. BKC products and services have met with popular approval and, as a result of BKC's extensive sales, advertising, promotion, and publicity, the public is familiar with the BKC Marks. The products and services associated with the BKC Marks are understood by the public to be produced, marketed, sponsored, supplied by, and/or affiliated with BKC.

## **THE BURGER KING SYSTEM**

25. BKC has developed a comprehensive restaurant operating system for all BKC franchisees in order to protect the image of BURGER KING® restaurants and to ensure uniform, high quality standards. The detailed specifications and procedures of the "Burger King System" are set forth in BKC's Manual of Operating Data (the "OPS Manual").

26. Every BKC franchisee is required by its franchise agreement to operate its franchise in accordance with the specifications and procedures contained in the OPS Manual. The OPS Manual sets forth in detail the mandatory BKC restaurant operating standards, specifications, and procedures, including rules governing areas such as food preparation and handling, cleanliness, health, sanitation, quality, and speed of service. In addition to these strict quality, service, and cleanliness requirements, the OPS Manual prescribes specified training procedures to ensure that these requirements are met. The OPS Manual is a confidential BKC document which a franchisee is permitted to have only during the term of the franchise agreement.

27. BKC offers a broad range of services to its franchisees in order to monitor and assist

a franchisee's compliance with these standards, including training for various levels of personnel as well as other regional and local training and instructional programs. This enables BKC to safeguard the integrity of BURGER KING® restaurants, the BURGER KING® System, and the BKC Marks.

28. Integral to BKC's compliance and assistance program are periodic inspections and consultations undertaken by BKC personnel and designees specially trained to observe and advise in all areas of restaurant operating procedure. Pursuant to BKC's restaurant visitation process, action plans are issued after a restaurant inspection is conducted. These action plans serve as a training opportunity for the franchisee and as a quality assurance process for BKC to ensure that critical quality, service, and cleanliness standards are being met by the franchisee. Each BURGER KING® Restaurant Franchise Agreement confers upon BKC the right to enter the restaurant premises to perform this vital function.

29. As a result of its substantial expenditures of money and effort in developing and implementing the BURGER KING® System, BKC has established a high reputation and a positive image with the public as to the quality of products and services available at BURGER KING® restaurants, which reputation and image have been, and continue to be, valuable assets of BKC. BKC strives to maintain that reputation through its careful selection of authorized franchise owners, facilities, and locations and its careful supervision over the manner and quality of its restaurant service.

**BKC'S WRITTEN AGREEMENTS WITH DEFENDANTS**

**A. The Franchise Agreements**

30. Company owned and operated 14 franchised BURGER KING® Restaurants ("Restaurant") in Michigan using BKC's systems and names, including service marks and

trademarks, in accordance with the terms and conditions of 14 BURGER KING® Restaurant Franchise Agreements (collectively the "Franchise Agreements"), as set forth below:

| BURGER KING® Restaurant Number | Address | Franchise Agreement Dated |
|---|---|---|
| 237 | 3625 South Dort Highway, Flint, MI 48507 | 9/18/2017 |
| 410 | 28203 Plymouth Road, Livonia, MI 48150 | 4/27/2017 |
| 1284 | 8201 Woodward Avenue, Detroit, MI 48202 | 4/27/2017 |
| 3532 | 1113 East West Maple Road, Walled Lake, MI 48390 | 1/2/2018 |
| 3995 | 34835 Plymouth Avenue, Livonia, MI 48150 | 4/27/2017 |
| 4149 | 18021 Kelly Road, Detroit, MI 48224 | 4/27/2017 |
| 7056 | 20240 Plymouth Road, Detroit, MI 48228 | 8/31/2016 |
| 9897 | 9774 East M-36, Whitmore Lake, MI 48189 | 4/27/2017 |
| 10437 | 12661 Mack Avenue, Detroit, MI 48215 | 8/31/2016 |
| 10753 | 9239 Gratiot Avenue, Detroit, MI 48213 | 8/31/2016 |
| 11891 | 3801 Clio, Flint, MI 48504 | 10/9/2018 |
| 12421 | 13324 Woodward Avenue, Highland Park, MI 48203 | 10/9/2018 |
| 21688 | 16245 Livernois Ave, Detroit, MI 48221 | 11/17/2015 |
| 22126 | 3863 W Jefferson Ave, Ecorse, MI 48229 | 5/25/2016 |

### B. The Guarantees

31.     Pursuant to written guarantees, Guarantors jointly, severally, absolutely and unconditionally guaranteed the payment and performance of each and every obligation of Company under the Franchise Agreements (hereinafter collectively the "Guarantees").

### RELEVANT TERMS OF THE PARTIES' AGREEMENTS

32.     Under the terms of the Franchise Agreements, Company is obligated to make payments to BKC for royalties, advertising and other fees. Specifically, the Franchise Agreements require Company to pay BKC a royalty of a certain percentage of weekly gross sales in return for the use of the BURGER KING® System and the BKC Marks. Additionally, the Franchise Agreements obligate Company to pay BKC an amount equal to a certain percentage of monthly

gross sales for the preceding calendar month in return for advertising, sales promotion and public relations expenditures made by BKC on behalf of the entire BURGER KING® System. All royalty and advertising payments are required to be made to BKC in Miami, Florida. The Franchise Agreements each provide that the failure to make such payments constitutes an act of default under the Franchise Agreements.

## DEFENDANTS' DEFAULTS UNDER THE AGREEMENTS

33. The Franchise Agreements and Guarantees (collectively the "Agreements") contain provisions regarding default and establishing the parties' rights and obligations in the event of a default by Defendants thereunder.

34. By letter dated February 14, 2023, BKC notified Defendants that they were in default of their obligations under the Agreements (the "Notices of Default").

35. Specifically, Defendants failed to pay amounts when due for royalties, advertising, and other charges for the Restaurants under the Franchise Agreements and Guarantees.

36. As a result of Defendants' failure to timely cure the defaults under the Franchise Agreements, the Franchise Agreements terminated effective March 3, 2023.

37. By letter dated March 3, 2023, BKC notified Defendants of the termination of the Franchise Agreements and demanded compliance with the post-termination covenants contained therein.

## TERMINATION

38. Terminated and expired franchisees are prohibited from identifying themselves as either a current or former BURGER KING® Franchisee, from displaying or using any of BKC's trade secrets, promotional materials, the BKC Marks, or any mark confusingly similar. Terminated and expired franchisees are further required, upon termination or expiration of their BURGER

KING® Restaurant Franchise Agreement, to immediately make such removals or changes in signs and the building as BKC shall request so as to effectively distinguish the building and premises from its former appearance and from any other BURGER KING® restaurant.

39. In violation of the Franchise Agreements, Defendants continue to hold themselves out to the public as owning and/or operating genuine and authorized BURGER KING® Restaurants by continuing to display and/or use the BKC Marks at the Restaurants subsequent to the Franchise Agreements' termination. In so doing, Defendants are infringing upon the BKC Marks and breaching their explicit obligations under the Franchise Agreements.

40. Additionally, Defendants have not returned the OPS Manual and other operational manuals to BKC as required by the Franchise Agreements.

## LIKELIHOOD OF CONSUMER CONFUSION AND DECEPTION

41. Defendants have not tendered to BKC or removed all BURGER KING® signs, logos, menu boards, posters, translights, uniforms, plates, cups, tray liners, and other items bearing the BKC Marks, name, symbols, or slogans, or which are otherwise identified with BURGER KING® restaurants and are located at the Restaurants.

42. Defendants' continued use of the BKC Marks or any items associated with the BURGER KING® name, symbols, or slogans at the Restaurants is without BKC's license or consent, and has caused or is likely to cause mistake, confusion, or deception in the minds of the public as to source, affiliation, and sponsorship. Upon seeing the familiar BKC Marks, through Defendants' unauthorized use or display thereof, consumers will be deceived into concluding that the products and services sold at the Restaurants are made or supplied by BKC, are prepared in the prescribed BKC manner and subject to BKC's supervision, are sponsored or endorsed by BKC, and bear the BKC Marks pursuant to BKC's authority and permission. Such impressions are

calculated to and will have a material influence on customers' purchasing decisions, inducing them to patronize the Restaurants in reliance on the goodwill, reputation, and appeal of BKC.

43.     By reason of the foregoing, BKC has suffered damages, in an amount presently unknown yet substantial.  BKC is no longer is the source or sponsor of the Restaurants and does not endorse said Restaurants, or the products and services provided therein, has not authorized Defendants to use or display the BKC Marks to identify the terminated franchise facilities, products, or services, and has protested expressly against such use.

44.     By virtue of the termination of the Franchise Agreements, BKC is unable to control the nature and quality of the goods and services that Defendants provide at the Restaurants.

45.     BKC will suffer serious, immediate, and irreparable harm if Defendants' willful infringement of the BKC Marks at the Restaurants is not immediately enjoined.  BKC's goodwill and reputation will suffer drastically by virtue of the public's identification of BKC with the management and operation of the Restaurants.

46.     BKC exercises strict quality control over every phase in the marketing of BURGER KING® products and services, from specification of ingredients, to the supervision of food preparation and handling, to the maintenance of strict standards as to cleanliness, health, sanitation, and quality of service.  The carefully nurtured image which BKC now enjoys will be irretrievably injured by any association with the Restaurants, which no longer are subject to BKC's control and supervision.

47.     Defendants' sale of products and services under the BKC Marks at the Restaurants poses an immediate threat to the distinct, exclusive image BKC has created at great expense for its franchisees.  BURGER KING® restaurants, services, and products are known by the BKC Marks which are emblematic of their distinctive source.  BURGER KING® restaurants enjoy a special

appeal to consumers which will be diluted by the existence of infringing restaurants with products and services bearing the distinctive BKC Marks.  The intangible, but commercially indispensable, value that the BURGER KING® restaurants now enjoy will be severely undermined by the operation of the Restaurants, which are making unauthorized use of the BKC Marks.

48. Consumer confusion as to the source or sponsorship of restaurants bearing the BKC Marks will be attended not only by an inevitable loss of product distinctiveness, image, and goodwill, but will also cause a diversion of sales from BKC.  The economic injury to BKC resulting from such diversion is incalculable and, as such, is an additional source of irreparable harm.

## COUNT I
## LANHAM ACT INFRINGEMENT

49. BKC re-alleges Paragraphs 1 through 48 above as if fully set forth herein.

50. Defendants' acts constitute infringements of BKC's registered trademarks and service marks in violation of Section 32 of the Lanham Act, 15 U.S.C. 1114.

## COUNT II
## LANHAM ACT FALSE DESIGNATIONS

51. BKC re-alleges Paragraphs 1 through 48 above as if fully set forth herein.

52. Defendants' acts constitute false designations of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a).

## COUNT III
## COMMON LAW TRADEMARK INFRINGEMENT

53. BKC re-alleges Paragraphs 1 through 48 above as if fully set forth herein.

54. Defendants' acts constitute unlawful trademark and service mark infringements under the common law.

## COUNT IV
## COMMON LAW UNFAIR COMPETITION

55. BKC re-alleges Paragraphs 1 through 48 above as if fully set forth herein.

56. Defendants' acts constitute unfair competition under the common law.

## COUNT V
## BREACH OF FRANCHISE AGREEMENTS
## (Against Company)

57. BKC re-alleges and incorporates Paragraphs 1 through 48 above as if fully set forth herein.

58. Company breached the Franchise Agreements as a result of its failure to pay BKC amounts due thereunder.

59. Additionally, Company's operation of the Restaurants after the expiration of the Franchise Agreements and its failure to abide by the post-termination covenants constitute breaches of the Franchise Agreements.

60. These breaches have directly and proximately loss and damage to BKC.

## COUNT VI
## BREACH OF GUARANTEES
## (Against Diaz and EYM)

61. BKC re-alleges and incorporates Paragraphs 1 through 48, and 58 through 60 above as if fully set forth herein.

62. Company breached the Franchise Agreements as a result of its failure to pay amounts due to BKC thereunder.

63. Company also breached the Franchise Agreements as a result of its operation of the Restaurants after the termination of the Franchise Agreements and its failure to abide by the post-termination covenants therein.

64. Pursuant to the Guarantees, Guarantors jointly, severally, unconditionally and

irrevocably personally guaranteed to BKC the payment and performance of each and every obligation of Company under the Franchise Agreements should Company fail to perform such obligations.

65. The failure of Guarantors to ensure Company's compliance with the Franchise Agreements constitute breaches of the Guarantees.

66. These breaches have directly and proximately caused loss and damage to BKC.

## **DEMAND FOR ATTORNEYS' FEES AND COSTS**

The Agreements at issue in this litigation provide that the prevailing party is entitled to its attorneys' fees and costs. BKC hereby demands that it be reimbursed by Defendants for all costs and expenses (including attorneys' fees) relating to prosecution of this action.

WHEREFORE, Plaintiff Burger King Company LLC demands judgment against Defendants Eduardo E. Diaz, EYM King of Michigan, LLC and EYM King, L.P., jointly and severally:

1. For preliminary and permanent injunction enjoining Defendants, and all persons acting on their behalf, in concert with them, or under their control, from:

   (a) manufacturing, packaging, distributing, selling, advertising, displaying, or promoting any product or service bearing any of the BKC Marks, or any colorable imitation thereof at the Restaurants;

   (b) displaying or using any of the BKC Marks to advertise or promote the sale of, or to identify, the Restaurants, or any product or service provided therein; and

   (c) making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Defendants, the Restaurants, and the products and services provided therein, are in any manner,

        directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized, or approved by Burger King Company LLC.

2. For preliminary and permanent injunctions directing Defendants, and all persons acting on their behalf, in concert with them, or under their control, to, with respect to the Restaurants:

    (a)    recall and deliver up to Burger King Company LLC all signs, banners, labeling, packaging, advertising, promotional, display, and point-of-purchase materials which bear, or make reference to, any of the BKC Marks, or any colorable imitation of the BKC Marks;

    (b)    recall and deliver up to Burger King Company LLC all copies and editions of the OPS Manuals that are in their actual or constructive, direct or indirect, possession, custody or control, including all supplements and addenda thereto, and all other materials containing restaurant operating instructions, restaurant business practices, or plans of Burger King Company LLC;

    (c)    allow Burger King Company LLC, at a reasonable time, to enter the premises of the Restaurants and make whatever changes, including removal of tangible assets, that are necessary to distinguish the premises from their appearance as BURGER KING® Restaurants;

    (d)    account and pay over to Burger King Company LLC all gains, profits, and advantages derived by Defendants from the trademark and service mark infringement, breach of contract, and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. §1117, and by the controlling principles of common law.

3. For money damages, plus three times additional actual damages BKC has sustained by reason of Defendants' trademark and service mark infringement, breach of contract, and unfair competition, pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

4. For punitive damages because of the willful nature of Defendants' actions;

5. For pre-judgment interest and Burger King Company LLC's reasonable attorneys' fees incurred in protecting its rights in this action in accordance with the terms of the Franchise Agreements and, because of the willful nature of the infringement, pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

6. For an order enjoining Defendants from operating a quick service hamburger restaurant within a two-mile radius of the Restaurants for a one-year period;

7. For an order directing Defendants to file with the Court, and to serve on Burger King Company LLC's counsel within ten days after service of any injunction or order issued herein, or within such a reasonable time as the Court shall direct, a report, in writing and under oath, setting forth in detail the manner in which Defendants have complied with such injunction or order;

8. For all costs, disbursements, and expenses of this action; and

9. For all such other relief as this Court may deem just and proper.

Dated: March 13, 2023.                    Respectfully submitted,


                                                             **s./ Jessica Serell Erenbaum**
                                                             _____
                                          Michael D. Joblove
                                          Florida Bar No.: 354147
                                          mdjoblove@venable.com
                                          Jessica Serell Erenbaum
                                          Florida Bar No.: 816000
                                          jserenbaum@venable.com
                                          Venable LLP
                                          4400 Miami Tower
                                          100 Southeast Second Street
                                          Miami, Florida 33131
                                          Telephone: (305) 349-2300

                                          *Attorneys for Plaintiff Burger King Company LLC*